UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
KLG GATES LLP,

                    Appellant,

     -vs.-

ROY E. BROWN,

                    Appellee.
----------------------------------------------------------X

FILED
CLERK
12/18/2013 10:02 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-4972 (ADS)

**APPEARANCES:**

**Silverman, Acampora LLP**
*Attorneys for the Appellant*
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753
   By: Anthony C. Acampora, Esq., Of Counsel

**Law Office of Daniel L. Abrams, PLLC**
*Attorneys for the Appellee*
2 Penn Plaza
Suite 1910
New York, NY 10121
   By: Daniel L. Abrams, Esq., Of Counsel

**SPATT, District Judge**.

     This is an appeal filed on September 5, 2013 by the appellant KLG Gates LLP ("KLG") from the orders of the United States Bankruptcy Court, Eastern District of New York (Eisenberg, J.), entered on April 29, 2013 and July 8, 2013, disqualifying KLG as counsel to (a) the Brown Publishing Company ("BPC") and Brown Media Holdings Company ("BMH" and collectively, the "Debtors") and (b) the Brown Publishing Company Liquidating Trust (the "Liquidating Trust"), and ordering KLG to disgorge $100,000 of previously approved and paid fees. The Bankruptcy Court disqualified KLG based on its conclusions that (a) an implied pre-petition attorney-client relationship existed between KLG and certain of the Debtors' managers and (b)

1

KLG's 2010 Statement pursuant to Federal Rule of Bankruptcy Procedure 2014 ("Rule 2014") failed to adequately inform the Court of its relationship with those managers, creditors of the Debtors, and other parties in interest. For the following reasons, the Court reserves decision on the appeal and directs the parties to submit supplemental briefing on the issue of KLG's standing.

## I. BACKGROUND

In late 2008, certain BPC managers feared that Windjammer Capital ("Windjammer"), a BPC warrant holder, would exercise an equity "put" option that would ultimately result in the forced sale of the Debtors' assets to repay Windjammer for mezzanine financing BPC obtained from Windjammer.

On December 11, 2008, Joel Dempsey ("Dempsey"), as BPC's General Counsel, called then-KLG Partner Edward Fox ("Fox") for advice on how the managers could retain control of BPC in light of the threat posed by Windjammer. Dempsey and Fox had worked together at a law firm between 1995-1997. Fox asserts that he was being asked for advice from, and was giving advice to, Dempsey solely in Dempsey's capacity as BPC's general counsel, and not on behalf of any insiders of BPC in their personal capacities.

On December 12, 2008, Dempsey sent Fox a follow-up email, with an attached memorandum (the "Warrant Put Memo"). The Warrant Put Memo set forth a version of a plan Dempsey had proposed to deal with Windjammer. Specifically, Dempsey, Roy Brown, and Joseph Ellingham (collectively the "Brown Insiders") would form a company referred to as "New LLC," which would acquire all of the Debtors' assets in such a way that BPC's unfavorable tax status would not carry over to New LLC. Once this was done, New LLC, as a

2

much more tax-efficient entity than BPC, could, by consent of the lenders. sell enough assets to raise $9 million and pay Windjammer.

In follow-up conversations between Fox, Dempsey, and possibly Brown regarding the Warrant Put Memo, Fox admittedly provided some advice with respect to the New LLC Transaction. The parties dispute the precise subject matter of the follow-up conversations, particularly whether and to what extent the Brown Insiders' interests were emphasized as opposed to the Debtors' interests. Brown testified that Fox advised that the best way for the Brown Insiders to accomplish their goals of retaining control and getting rid of Windjammer was a quick sale of the Debtors' assets in bankruptcy to New LLC, under the provisions of 11 U.S.C. § 363. Fox testified that the primary subject matter of the discussions was the extent to which the New LLC transaction might saddle the Debtors with onerous tax liabilities. Fox stated that he dismissed the New LLC Transaction as a "crazy tax avoidance scheme" which the IRS might not support. Fox also stated that, to the extent the question of whether and under what conditions the Brown Insiders could purchase the Debtors' assets was discussed, he advised that, in bankruptcy, any transaction involving the Brown Insiders would be heavily scrutinized by the Bankruptcy Court, and that any bid would have to be subject to higher and better offers.

Dempsey testified that he had a laundry list of questions for Fox that bore both on the financial health of the Debtors and the interests of the BPC shareholders. Dempsey also testified that Fox advised against pursuing the New LLC Transaction outside bankruptcy, and he advised that – "all of these questions," including the – successor liability problems, could be answered in bankruptcy. Nonetheless, at this point, on December 29, 2008, Fox advised Dempsey that the proposed transaction might be disregarded by the IRS or the courts as a sham, and that the

3

Brown Insiders might be personally liable for BPC's tax and other obligations under doctrines of corporate veil-piercing and successor liability.

That same day, Fox sent Dempsey an engagement letter, which was dated December 24, 2008 (the "First Engagement Letter"). The First Engagement letter was addressed to Dempsey as Vice President and General Counsel of BPC, and included a signature line for Dempsey to sign in that capacity. The First Engagement Letter also requested a $10,000 fee, which the Debtors paid. From December 2008 through the Debtors' bankruptcy filing on April 30, 2010, KLG billed BPC for its work and was paid by BPC only. KLG never issued a bill to Brown, Dempsey, or any other Manager individually and never received a payment from any of them.

The First Engagement Letter provided that KLG understood that it was

> being engaged to act as counsel solely for Brown Publishing Company and not for any affiliated entity (including parents and subsidiaries), shareholder, director, officer or employee of Brown Publishing Company not specifically identified herein.

Between January and May or June of 2009, there was very little contact between KLG and the Debtors. KLG did not issue any invoices to the Debtors during this period.

Further, during this time period, the Brown Insiders tried, unsuccessfully and apparently unknown to KLG, to effectuate a transaction outside bankruptcy to avoid many of the aforementioned tax and successor-liability problems. About January of 2009, Dempsey and Ellingham formed New LLC, as contemplated in the Warrant Put Memo. However, they did so only under a different name: Business Publications, LLC ("Business Publications"), one of the Debtors in this case. This was done in a bid to effectuate the New LLC Transaction as proposed in the Warrant Put Memo. This attempt failed and was not further pursued.

On June 5, 2009, Brown and Dempsey met with Fox and Eric Moser ("Moser"), another former KLG partner, in KLG's Manhattan offices. Brown testified that the dominant subject

matter for discussion at the meeting was how BPC's shareholders might acquire the Debtors' assets, free and clear of liens, through a quick bankruptcy sale to a new company, under 11 U.S.C. § 363, and thus maintain their control over the Debtors' businesses. Comparatively little was discussed otherwise with respect to the Debtors' affair. Brown further stated that, after this meeting, based on KLG's advice, he felt confident that a bankruptcy filing, followed by a quick § 363 sale, would be the best way for the BPC shareholders to maintain control while otherwise dealing with the Windjammer problem.

By contrast, Fox and Moser testified that this was just a typical, pre-bankruptcy meeting with the principals of a corporate client. They also testified that, insofar as a purchase by the Brown Insiders was discussed, they indicated that this was possible, but the insiders' bids would be subject to better bids, and an independent director would need to be appointed to oversee the sale process so as to avoid the taint of a conflict of interest.

Thereafter, in July 2009, Fox sent Dempsey a retainer agreement, serving as a rider to the First Engagement Letter. The retainer agreement provided, in essence, that KLG would require a $100,000 retainer while representing the Debtors in bankruptcy. The retainer agreement stated that it was "[c]onfirming our discussions concerning the retainer payment in connection with our ongoing work for Brown Media Holdings, LLC [] and Brown Publishing Company." Both the First Engagement Letter and the Retainer Agreement were returned to KLG, signed by Roy Brown as President and Chief Executive Officer of BPC/BMH, in August of 2009.

On August 20, 2009, Fox sent Dempsey a letter asking for the Debtors to waive certain potential conflicts of interest on the part of KLG (the "Conflict Waiver Letter"). The Conflict Waiver Letter stated, in pertinent part:

> As you know, the Firm [KLG] currently represents [certain of the Debtors' secured lienholders] in connection with various lending and other matters (the "Bank Matters"). Accordingly, if the Firm were to represent Brown in the Brown Matter [i.e. the Debtors' bankruptcies], the Firm would have ongoing duties of loyalty to both Brown with respect to the Brown Matter and the Banks with respect to the Bank Matters . . . . Because the Brown Matter and the Bank Matters are not related, we believe that we would be able to provide appropriate representation of both Brown in the Brown Matter and the Banks in the Bank Matters and that our representation of each client will not be materially limited by our responsibilities to the other. Moreover, except for [Mr. Fox] and Eric Moser, who represent certain of the Banks in certain corporate trust matters, the Firm lawyers working for the Banks in the Bank Matters will not be involved in the representation of Brown in the Brown Matter.

Thus, as of August 2009, KLG was aware of a possible conflict on behalf of the Debtors and their lien creditors. In particular, at the time these bankruptcy cases were filed, Fox and Moser represented PNC Bank ("PNC") in its capacity as indenture trustee for certain bondholders in the highly publicized *Enron* bankruptcy case. Also, Fox and/or Moser represented Wilmington Trust, in its capacity as indenture trustee, in connection with the *Delphi* bankruptcy case. Fox and Moser were also the primary attorneys for the Debtors during the course of that case. Brown countersigned the Conflict Waiver Letter on behalf of the Debtors and returned it to KLG, thus apparently manifesting the Debtors' consent to the concurrent representations.

After the meeting of June 5, 2009, the Brown Insiders began seeking financing for their purchase of the Debtors' assets in bankruptcy. Brown testified that he informed Fox that he wanted to propose a transaction to certain of the Debtor's secured lienholders whereby they would finance a purchase, by the Brown Insiders, of the Debtors' assets in bankruptcy under 11 U.S.C. § 363, with a price tag large enough to make the secured lienholders whole. Fox advised that the secured lienholders should receive less than full payment, so as to avoid a situation where the Bankruptcy Court might disapprove the transaction.

6

In light of this concern, a series of email communications and document exchanges ensued between Brown, Dempsey, and Fox regarding the Brown Insiders' efforts to persuade the secured lienholders to fund their bankruptcy purchase of the Debtors' assets.

On August 22, 2009, Dempsey emailed Fox a memo, written by Brown, which was meant to go to Gary Best of PNC Bank, N.A., an agent to the secured lienholders. ("Draft Proposal Memo"). The Draft Proposal Memo was designed to convince the secured lienholders to support a transaction which was somewhat similar to the New LLC Transaction, only to be done in the bankruptcy context.

An email sent in early September 2009 asked Fox to review the Draft Proposal Memo and see if there were any "glaring problems." The email also remarked that the debt owing to the secured lienholders was about $69 million, and asked whether a price of $60 million was "enough of an impairment." Fox replied by email stating, "we'll take a look and get back to you."

The Draft Proposal Memo contemplated that the "managers" would put the Debtors in bankruptcy under Chapter 11 of the U.S. Bankruptcy Code, whereupon the Debtors would immediately file a motion under 11 U.S.C. § 363 to sell their assets in an open bidding process. The secured lienholders would finance a stalking-horse, or preliminary bid by "Newco," a new company formed by the "managers," of $60 million.

On September 9, 2009, Fox sent Dempsey an email containing a black-lined version of the Draft Responsive Memo, highlighting where Fox and/or someone else at KLG had made extensive edits (the "Edited Responsive Memo").

By this time, the Revised Proposal Memo had already been sent to Best at PNC. The most significant change in the Revised Proposal Memo was that it called for a purchase price that

7

ranged between $50-60 million, whereas the Draft Proposal Memo from Dempsey had called for a flat purchase price of $60 million.

PNC had expressed reservations about whether a quick sale of the Debtors' assets under 11 U.S.C. § 363 in Bankruptcy Court was a good solution to the Debtors' various problems. Thus, Brown and Dempsey drafted a memorandum to respond to PNC's concerns (the "Draft Responsive Memo"). The Draft Responsive Memo essentially explained the various options for dealing with BPC's debt, both bankruptcy-related and non-bankruptcy related. It also set forth the reasons why Brown believed that a quick sale in bankruptcy under 11 U.S.C. § 363 to Newco was the best option.

On October 30, 2009, Brown, Fox, and Dempsey met once again at KLG's Manhattan offices. The purpose of this meeting was for Brown and the other Brown Insiders to apprise KLG of the insiders' efforts to obtain financing to buy the Debtors' assets. Fox maintains that he never advised the insiders about their purchase of the assets, but that Dempsey kept him generally apprised of these matters.

In about January of 2010, the Brown Insiders were working primarily with three (3) prospective financiers: (1) Goldman Sachs; (2) Guggenheim Partners ("Guggenheim"); (3) Prospect Capital.

On January 22, 2010, Dempsey and Fox participated in a phone conference with representatives from Goldman Sachs. Fox insists that he attended this meeting at Dempsey's request, solely in his capacity as counsel for the Debtors. However, Brown testified that Fox touted the benefits of the § 363 sale to Goldman. Specifically, Brown stated that Fox explained, in essence, that a § 363 sale would proceed so quickly that other potential bidders would not have time to do their due diligence, which presumably decreases the likelihood of competing

bids and correspondingly increases the chances that the Brown Insiders, through Newco, would secure the Debtors' assets. The insiders did not have their own counsel at this time for this discussion. The Brown Insiders eventually reached an agreement with Guggenheim.

In March 2010, shortly before the filing of the bankruptcy petition, the Brown Insiders formed Newco, as contemplated in the Draft and Revised Proposal Memos, using a different name: Brown Media Corporation ("Brown Media"). The Brown Insiders were the only equity stakeholders in Brown. At this time, Fox provided Dempsey with a "preliminary list of tasks" that would need to be completed, including "[c]omplete negotiations regarding the APA." Fox advised Dempsey that "[o]bviously, this presumes that Newco has been formed *and retained counsel with whom we can negotiate to the extent necessary*."

On April 7, 2010, approximately three weeks prior to the Debtor's bankruptcy petition dates, on Fox's suggestion and recommendation, Brown Media retained Fox's friend, Richard Levy, to represent it in the course of negotiating an asset-purchase agreement (the "Brown Media APA") with the Debtors, under which Brown Media would serve as the stalking-horse bidder in the contemplated auction sale of the Debtors' assets under 11 U.S.C. § 363. Fox had become acquainted with Levy when they worked together at a prior law firm. Fox and KLG represented the Debtors in these stalking-horse negotiations, which lasted for several weeks, resulting in the execution of the Brown Media APA sometime after the instant bankruptcy petitions were filed.

KLG had previously informed the Brown Insiders that, if they wanted to participate in any auction sale of the Debtors' assets in bankruptcy, the Debtors would need to appoint an independent director to oversee all aspects of the sale, so as to remove any taint of conflicting interests from the transaction.

9

Initially, the principals of the Debtors wanted to hire Joseph Szfraniec, a director of BPC, for the job, and they offered Szfraniec the position on behalf of the Debtors. However, Szfraniec declined the position.

Fox later suggested and recommended his former colleague, Thomas Carlson, CPA, and a Certified Insolvency and Restructuring Advisor, for the position. Carlson is not an attorney, but he has significant experience in restructuring, reorganization, and auditing practice. Nevertheless, Carlson had no experience in the publishing business. Fox first became acquainted with Carlson in connection with the *Delphi* bankruptcy case. In that case, Fox represented Wilmington Trust, and Carlson was financial advisor to the creditors' committee. The Debtors' respective managing boards approved Carlson on April 30, 2010, the date the Debtors filed their petitions.

Between April 30, 2010 and May 1, 2010, each of the Debtors filed "bare bones" petitions for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code. The cases were ultimately consolidated for procedural purposes only. On May 4, 2010, three to four days after the instant bankruptcy filings, KLG moved to sell the Debtors' assets under 11 U.S.C. § 363, on expedited notice, with Brown Media as the proposed introductory bidder.

Each of the Debtors subsequently filed an application pursuant to 11 U.S.C. §§ 327 and 1107 to retain KLJ as counsel for their respective bankruptcy estates. Pursuant to Federal Rule of Bankruptcy Procedure 2014, KLG was required to submit an affidavit setting forth all connections between KLG and any parties in interest to the bankruptcy cases. Acting for KLG, Fox filed such an affidavit (the "Rule 2014 Affidavit"). The Rule 2014 Affidavit stated that the Debtors had 1,250 creditors, about 483 of which were being, or had been, represented by KLG in unrelated matters. An annexed exhibit alphabetically listed all 483 creditors. Among

the creditors listed are PNC and Wilmington Trust. The list specifies that PNC and Wilmington Trust were the agents for certain of the Debtors' lienholders. KLG contends that it could not have sued either PNC or Wilmington Trust on behalf of the Debtors if such litigation became necessary.

On June 28, 2010, the Bankruptcy Court approved the Debtor's retention of KLG. Fox and Moser were lead counsel and the primary billing attorneys for the Debtors.

On July 19, 2010, the § 363 sale of the Debtors' assets took place, lasting for roughly 23 hours, with multiple rounds of vigorous bidding, primarily between PNC and Brown Media. Levy appeared at the auction sale as counsel for Brown Media, and Fox appeared as counsel for the Debtors. The assets were sold in 3 different lots. Brown Media was declared the successful bidder for most of the Debtors' assets. Nonetheless, Guggenheim withdrew its financing commitment before Brown Media could close. Thus, PNC, as the next-highest bidder, became the successful bidder. The total purchase price tendered for the Debtors' assets, including cash and debt forgiveness, was approximately $27,090,000.

On June 16, 2011, the Court confirmed the Debtors' third amended joint plan of reorganization (the "Plan"). The Plan established the Brown Publishing Company Liquidating Trust to succeed to the assets of the Debtors' estates, including all causes of action. Carlson was appointed Liquidating trustee. The Plan provided that the liquidating trust could retain KLG on a contingent fee basis to pursue affirmative recoveries, which it did.

Meanwhile, on March 29, 2011, shortly before the Plan was confirmed, Carlson, Brown, and Dempsey, together with Brown's counsel, met at KLG's offices in Manhattan. At this meeting, Brown learned that he would likely be sued on behalf of the liquidating trust, yet he did not raise any opposition to confirmation.

Almost a year later, on March 15, 2012, Brown filed a pro se motion to disqualify KLG from representing the liquidating trust in connection with the litigation against him, referred to herein as the "Brown Adversary Proceeding" (the "Disqualification Motion"). The basis for the Disqualification Motion was that a conflict of interest arose, due to the fact that, pre-petition, KLG, rather than acting exclusively for the benefit of its "official" clients, the Debtors, was really acting for the benefit of Brown and other Brown Insiders, to help them to obtain the Debtors' assets in bankruptcy. On May 6, 2012, KLG, on behalf of the liquidating trust under seal, filed its objection to the Disqualification Motion under seal.

On September 17, 2012, Brown, this time, with the aid of counsel, filed a motion to amend the Disqualification Motion, citing newly discovered facts concerning KLG's representation of PNC and Wilmington Trust, and KLG's failure fully to disclose the nature of the representation in its Rule 2014 Affidavit (the "Motion to Amend"). The Motion to Amend also specifically asked that this Court order KLG to disgorge any legal fees it had been paid in connection with the instant bankruptcy cases.

While the Disqualification Motion was pending, Fox left KLG and joined a new law firm, Polsinelli. KLJ then, on behalf of the trust, moved to withdraw and substitute Fox and Polsinelli as counsel for the Liquidation Trust in the adversary proceedings. Fox had been the primary KLG partner in the matter and the one with most of the conflicts complained about in the Disqualification Motion.

On April 29, 2013, following a three-day evidentiary hearing, the Bankruptcy Court (1) disqualified KLG based on an implied, undisclosed, pre-petition attorney-client relationship between KLG and the managers and (2) held that KLG failed to make proper Rule 2014 disclosures. The Bankruptcy Court reserved decision on the issue of sanctions. The Bankruptcy

12

Court also indicated that, after a hearing on sanctions, an order "w[ould] be entered in this case on all matters raised and addressed." (Id. at 28.)

On May 16, 2013 following oral argument, the Bankruptcy Court indicated that it would deny KLG's motion to substitute. The Bankruptcy Court noted on the record that "Fox clearly papered the case to look as if he were representing the debtor only. But his actions say differently. Unfortunately for him, Mr. Brown kept every e-mail."

On May 20, 2013 the Bankruptcy Court formally denied the motion to substitute and directed the Liquidation Trustee to secure new counsel independent of Fox and KLG.

On June 27, 2013, the Bankruptcy Court made the following remarks on the record:

> [F]or two and a half years while this case was going on Mr. Brown never said anything about there being a reason to disqualify KLG Gates. All along when he thought that KLG Gates was helping him that was okay. It did not -- he did not bring the issue that you [Mr. Brown's counsel] provided him with to the Court until he became subject to litigation, and then felt that it was a good tactic.
>
> Now, he has a legal background, he knows when to bring an action or when not to . . .

On July 8, 2013, the Bankruptcy Court (1) confirmed KLG's disqualification from the main bankruptcy case; and (2) directed KLG to return $100,000 of the money it made in the bankruptcy case to the Trust. KLG, rather than the Liquidation Trustee, now appeals pursuant the July 8, 2013, and April 28, 2013 orders pursuant to 28 U.S.C. § 158(a).

## II. DISCUSSION

As a preliminary matter, although not raised by the parties, this Court must address whether it has appellate jurisdiction in this case.

The criteria for standing in a bankruptcy proceeding is more stringent than the "injury in fact" requirement under Article III. See Kane v. Johns–Manville Corp., 843 F.2d 636, 642 n. 2

(2d Cir. 1988).  In the Second Circuit, a party appealing a bankruptcy court ruling must be an "aggrieved person." Licensing by Paola, Inc. v. Sinatra, 126 F.3d 380, 388 (2d Cir. 1997).  An aggrieved person is one that is "directly and adversely affected pecuniarily by the challenged order of the bankruptcy court." Id.

A review of the case law suggests that the courts in this Circuit have not yet addressed whether the counsel to a party in a bankruptcy proceeding, rather than the party itself, has standing to appeal an order disqualifying the counsel. In re Vebeliunas, 246 B.R. 172, 173 (S.D.N.Y. 2000), involved an appellant, Warren R. Graham and his law firm, that had been disqualified as counsel for the trustee in a Chapter 7 case.  However, the Court did not address the firm's appellate standing.  Rather, the District Court dismissed that appeal on the ground that the order from which the firm appealed from was not final.

The case most on point, although not in the Second Circuit, is In re Blinder Robinson & Co., Inc., 132 B.R. 759, 760 (D. Colo. 1991).  There, the trustee of a bankruptcy estate moved to disqualify the attorneys representing a creditor of the estate.  The Bankruptcy Court granted the motion to disqualify, and both the creditor and the attorneys appealed.  The trustee contended that the attorneys never became parties to the bankruptcy proceeding, and, consequently, lacked standing to challenge the disqualification order.

Relying on Richardson–Merrell, Inc. v. Koller, 472 U.S. 424, 105 S. Ct. 2757, 86 L. Ed. 2d 340 (1985), the District Court dismissed the attorneys' appeal for lack of standing.  The District Court rejected as insufficient to confer standing the argument by the counsel that their personal reputations were at issue.

In Richardson–Merrell, a non-bankruptcy case, the Supreme Court of the United States held that the decision whether to pursue an appeal of an attorney's disqualification belongs to the

14

client. Id. at 435; see also Wilson v. Southwest Airlines, Inc., 880 F2d 807, 817 (5th Cir. 1989) (holding that only parties to an action may appeal judgments rendered in that action); Law Offices of Seymour M. Chase, PC v. Federal Communications Comm'n, 843 F2d 517, 518 (DC Cir. 1988) (holding that a disqualification order is unreviewable when the appeal is filed by the attorney rather than the client). Whether a similar rule applies for an appeal from a disqualification in bankruptcy court, where conflicts of interest may be more prevalent than in ordinary civil litigation, is unclear.

In re M.T.G., Inc., 298 B.R. 310, 316 (E.D. Mich. 2003) also weighs against the KLG. In that case, a motion was made to vacate an employment order authorizing a successor Chapter 7 trustee's retention of an attorney, who previously was counsel for a Chapter 11 debtor. The Bankruptcy Court granted the motion to vacate, and the successor trustee and attorney appealed.

The Appellees contended that that the attorney lacked standing to bring the appeal. The District Court noted that while the contention that the attorney lacked appellate standing "may be true," there was no standing issue for the appeal because it was brought by both the successor trustee and the attorney. Id. at 316 n. 12. Here, by contrast, the appeal was brought by the trustee's counsel only.

### III. CONCLUSION

Although neither party raises the issue of standing, it is well-settled that federal courts are under an independent obligation to examine their own jurisdiction. See Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed.2d 556 (1984). However, at this time, and in the absence of briefing by the parties on this issue, the Court is not prepared to make any findings as to KLG's appellate standing. For this reason, within twenty days of the date of this order, the Court directs KLG to submit a supplemental brief not in excess of ten pages addressing, in light of the above-

15

mentioned cases, its standing before this Court. Brown will then have twenty days to submit an opposition brief not in excess of ten pages, followed by ten days for KLG, if it chooses, to submit a reply brief, not in excess of five pages.

**SO ORDERED.**

Dated: Central Islip, New York
December 18, 2013

                                         *Arthur D. Spatt*
                                         ARTHUR D. SPATT
                                         United States District Judge