UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
KLG GATES LLP,

                    Appellant,              **MEMORANDUM OF
DECISION AND ORDER**
     -vs.-                                    13-cv-4972 (ADS)
ROY E. BROWN,

                    Appellee.
-------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Silverman, Acampora LLP**
*Attorneys for the Appellant*
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753
  By:  Anthony C. Acampora, Esq., Of Counsel

**Law Office of Daniel L. Abrams, PLLC**
*Attorneys for the Appellee*
2 Penn Plaza
Suite 1910
New York, NY 10121
  By:  Daniel L. Abrams, Esq., Of Counsel

**SPATT, District Judge**.

      This is an appeal filed on September 5, 2013 by the appellant KLG Gates LLP ("KLG"),

a law firm, from the orders of the United States Bankruptcy Court, Eastern District of New York

(Eisenberg, J.), entered on April 29, 2013 and July 8, 2013 (the "Disqualification Orders").

These orders disqualified KLG as counsel to (1) the Brown Publishing Company ("BPC") and

Brown Media Holdings Company ("BMH" and collectively, the "Debtors") and (2) the Brown

Publishing Company Liquidating Trust (the "Liquidating Trust"), and ordered KLG to disgorge

$100,000 of previously approved and paid fees.  The Bankruptcy Court disqualified KLG based

on its conclusions that (1) an implied pre-petition attorney-client relationship existed between

KLG and certain of the Debtors' managers and (2) KLG's 2010 Statement pursuant to Federal Rule of Bankruptcy Procedure 2014 ("Rule 2014") failed to adequately inform the Court of its relationship with those managers, certain creditors of the Debtors, and other parties in interest.

For the following reasons, the appeal is granted in part and denied in part.

## I.  BACKGROUND

In late 2008, certain BPC managers feared that Windjammer Capital ("Windjammer"), a BPC warrant holder, would exercise an equity "put" option that would ultimately result in the forced sale of the Debtors' assets to repay Windjammer for mezzanine financing obtained by BPC.

On December 11, 2008, Joel Dempsey ("Dempsey"), as BPC's General Counsel, called then-KLG Partner Edward Fox ("Fox") for advice on how the managers could retain control of BPC in light of the threat posed by Windjammer.  Dempsey and Fox had worked together at a law firm from 1995 to 1997.  Fox asserts that he was being asked for advice from, and was giving advice to, Dempsey, solely in Dempsey's capacity as BPC's general counsel, and not on behalf of any insiders of BPC in their personal capacities.

On December 12, 2008, Dempsey sent Fox a follow-up email, with an attached memorandum (the "Warrant Put Memo").  The Warrant Put Memo set forth a version of a plan Dempsey had proposed to deal with Windjammer.  Specifically, Dempsey, Roy Brown, BPC's President and CEO, and Joseph Ellingham, BPC's Vice President and CFO (collectively the "Brown Insiders") would form a company referred to as "New LLC," which would acquire all of the Debtors' assets in such a way that BPC's unfavorable tax status would not carry over to the New LLC.  Once this was done, the New LLC, as a much more tax-efficient entity than BPC, could, by consent of the lenders, sell enough assets to raise $9 million and pay Windjammer.

2

In follow-up conversations between Fox, Dempsey, and possibly Brown regarding the Warrant Put Memo, Fox admittedly provided some advice with respect to the New LLC Transaction. The parties dispute the precise subject matter of the follow-up conversations, particularly whether and to what extent the Brown Insiders' interests were emphasized as opposed to the Debtors' interests. Brown testified that Fox advised that the best way for the Brown Insiders to accomplish their goals of retaining control and eliminating the threat posed by Windjammer was a quick sale of the Debtors' assets in bankruptcy to New LLC, under the provisions of 11 U.S.C. § 363. Fox testified that the primary subject matter of the discussions was the extent to which the New LLC transaction might saddle the Debtors with onerous tax liabilities. Fox stated that he dismissed the New LLC Transaction as a "crazy tax avoidance scheme" which the IRS might not support. Fox also stated that, to the extent the question of whether and under what conditions the Brown Insiders could purchase the Debtors' assets was discussed, he advised that, in bankruptcy, any transaction involving the Brown Insiders would be heavily scrutinized by the Bankruptcy Court, and that any bid by them would have to be subject to higher and better offers.

Dempsey testified that he had a laundry list of questions for Fox that bore both on the financial health of the Debtors and the interests of the BPC shareholders. Dempsey also testified that Fox advised against pursuing the New LLC Transaction outside bankruptcy, and he further advised that – "all of these questions," including the – successor liability problems, could be answered in bankruptcy. Nonetheless, at this point, on December 29, 2008, Fox advised Dempsey that the proposed transaction might be disregarded by the IRS or the courts as a sham, and that the Brown Insiders might be personally liable for BPC's tax and other obligations under doctrines of corporate veil-piercing and successor liability.

3

On or about December 29, 2008, Fox sent Dempsey an engagement letter, which was dated December 24, 2008 (the "First Engagement Letter").  The First Engagement letter was addressed to Dempsey as Vice President and General Counsel of BPC, and included a signature line for Dempsey to sign in that capacity.  The First Engagement Letter also requested a $10,000 fee, which the Debtors paid.  From December 2008 through the Debtors' bankruptcy filing on April 30, 2010, KLG billed BPC for its work and was paid by BPC only.  KLG never issued a bill to Brown, Dempsey, or any other Manager individually and never received a payment from any of them.

The First Engagement Letter provided that KLG understood that it was

being engaged to act as counsel solely for Brown Publishing Company and not for any affiliated entity (including parents and subsidiaries), shareholder, director, officer or employee of Brown Publishing Company not specifically identified herein.

Between January and May or June of 2009, there was very little contact between KLG and the Debtors.  KLG did not issue any invoices to the Debtors during this period.

Further, during this time period, the Brown Insiders tried, unsuccessfully and apparently unknown to KLG, to effectuate a transaction outside bankruptcy to avoid many of the aforementioned tax and successor-liability problems.  In about January of 2009, Dempsey and Ellingham formed New LLC, as contemplated in the Warrant Put Memo.  However, they did so under a different name: Business Publications, LLC ("Business Publications"), one of the Debtors in this case.  This was done in a bid to effectuate the New LLC Transaction as proposed in the Warrant Put Memo.  This attempt failed and was not further pursued.

On June 5, 2009, Brown and Dempsey met with Fox and Eric Moser ("Moser"), another former KLG partner, in KLG's Manhattan offices.  Brown testified that the dominant subject matter for discussion at the meeting was how BPC's shareholders might acquire the Debtors'

4

assets, free and clear of liens, through a quick bankruptcy sale to a new company, under 11 U.S.C. § 363, and thus maintain their control over the Debtors' businesses.  Comparatively little was discussed otherwise with respect to the Debtors' affairs.  Brown further stated that, after this meeting, based on KLG's advice, he felt confident that a bankruptcy filing, followed by a quick § 363 sale, would be the best way for the BPC shareholders to maintain control while otherwise dealing with the Windjammer problem.

By contrast, Fox and Moser testified that this was just a typical, pre-bankruptcy meeting with the principals of a corporate client.  They also testified that, insofar as a purchase by the Brown Insiders was discussed, they indicated that this was possible, but the insiders' bids would be subject to better bids, and an independent director would need to be appointed to oversee the sale process so as to avoid the taint of a conflict of interest.

Thereafter, in July 2009, Fox sent Dempsey a retainer agreement, serving as a rider to the First Engagement Letter.  The retainer agreement provided, in essence, that KLG would require a $100,000 retainer while representing the Debtors in bankruptcy.  The retainer agreement stated that it was "[c]onfirming our discussions concerning the retainer payment in connection with our ongoing work for Brown Media Holdings, LLC [] and Brown Publishing Company."  Both the First Engagement Letter and the Retainer Agreement were returned to KLG, signed by Roy Brown as President and Chief Executive Officer of BPC/BMH, in August of 2009.

On August 20, 2009, Fox sent Dempsey a letter asking for the Debtors to waive certain potential conflicts of interest on the part of KLG (the "Conflict Waiver Letter").  The Conflict Waiver Letter stated, in pertinent part:

> As you know, the Firm [KLG] currently represents [certain of the Debtors'
> secured lienholders] in connection with various lending and other matters (the
> "Bank Matters").  Accordingly, if the Firm were to represent Brown in the Brown

5

> Matter [i.e. the Debtors' bankruptcies], the Firm would have ongoing duties of loyalty to both Brown with respect to the Brown Matter and the Banks with respect to the Bank Matters . . . . Because the Brown Matter and the Bank Matters are not related, we believe that we would be able to provide appropriate representation of both Brown in the Brown Matter and the Banks in the Bank Matters and that our representation of each client will not be materially limited by our responsibilities to the other.  Moreover, except for [Mr. Fox] and Eric Moser, who represent certain of the Banks in certain corporate trust matters, the Firm lawyers working for the Banks in the Bank Matters will not be involved in the representation of Brown in the Brown Matter.

Thus, as of August 2009, KLG was aware of a possible conflict on behalf of the Debtors and their lien creditors.  In particular, at the time these bankruptcy cases were filed, Fox and Moser represented PNC Bank ("PNC") in its capacity as indenture trustee for certain bondholders in the highly publicized *Enron* bankruptcy case.  Also, Fox and/or Moser represented Wilmington Trust, in its capacity as indenture trustee, in connection with the *Delphi* bankruptcy case.  Fox and Moser were also the primary attorneys for the Debtors during the course of that case.  Brown countersigned the Conflict Waiver Letter on behalf of the Debtors and returned it to KLG, thus apparently manifesting the Debtors' consent to the concurrent representations.

After the meeting of June 5, 2009, the Brown Insiders began seeking financing for their purchase of the Debtors' assets in bankruptcy.  Brown testified that he informed Fox that he wanted to propose a transaction to certain of the Debtor's secured lienholders whereby they would finance a purchase, by the Brown Insiders, of the Debtors' assets in bankruptcy under 11 U.S.C. § 363, with a price tag large enough to make the secured lienholders whole.  Fox advised that the secured lienholders should receive less than full payment, so as to avoid a situation where the Bankruptcy Court might disapprove the transaction.

In light of this concern, a series of email communications and document exchanges ensued between Brown, Dempsey, and Fox regarding the Brown Insiders' efforts to persuade the secured lienholders to fund their bankruptcy purchase of the Debtors' assets.

On August 22, 2009, Dempsey emailed Fox a memo, written by Brown, which was meant to go to Gary Best of PNC Bank, N.A., an agent of the secured lienholders. ("Draft Proposal Memo"). The Draft Proposal Memo was designed to convince the secured lienholders to support a transaction which was somewhat similar to the New LLC Transaction, only to be done in the bankruptcy context.

An email sent by someone from BPC in early September 2009 asked Fox to review the Draft Proposal Memo and determine if there were any "glaring problems." The email also stated that the debt owing to the secured lienholders was about $69 million, and asked whether a price of $60 million was "enough of an impairment." Fox replied by email stating, "we'll take a look and get back to you."

The Draft Proposal Memo contemplated that the "managers" would put the Debtors in bankruptcy under Chapter 11 of the U.S. Bankruptcy Code. Then the Debtors would immediately file a motion under 11 U.S.C. § 363 to sell their assets in an open bidding process. The secured lienholders would finance a stalking-horse, or preliminary bid by "Newco," a new company formed by the "managers," of $60 million.

On September 9, 2009, Fox sent Dempsey an email containing a black-lined version of the Draft Responsive Memo, highlighting where Fox and/or someone else at KLG had made extensive edits (the "Edited Responsive Memo").

By this time, the Revised Proposal Memo had already been sent to Best at PNC. The most significant change in the Revised Proposal Memo was that it called for a purchase price that

7

ranged between $50-60 million, whereas the Draft Proposal Memo from Dempsey had called for a flat purchase price of $60 million.

PNC had expressed reservations about whether a quick sale of the Debtors' assets under 11 U.S.C. § 363 in Bankruptcy Court was a good solution to the Debtors' various problems. Thus, Brown and Dempsey drafted a memorandum to respond to PNC's concerns (the "Draft Responsive Memo"). The Draft Responsive Memo essentially explained the various options for dealing with BPC's debt, both bankruptcy-related and non-bankruptcy related. It also set forth the reasons why Brown believed that a quick sale in bankruptcy under 11 U.S.C. § 363 to Newco was the best option.

On October 30, 2009, Brown, Fox, and Dempsey met once again at KLG's Manhattan offices. The purpose of this meeting was for Brown and the other Brown Insiders to apprise KLG of the insiders' efforts to obtain financing to buy the Debtors' assets. Fox maintains that he never advised the insiders about their purchase of the assets, but that Dempsey kept him generally apprised of these matters.

In about January of 2010, the Brown Insiders were working primarily with three (3) prospective financiers: (1) Goldman Sachs; (2) Guggenheim Partners ("Guggenheim"); and (3) Prospect Capital.

On January 22, 2010, Dempsey and Fox participated in a phone conference with representatives from Goldman Sachs. Fox insists that he attended this meeting at Dempsey's request, solely in his capacity as counsel for the Debtors. However, Brown testified that Fox touted the benefits of the § 363 sale to Goldman. Specifically, Brown stated that Fox explained, in essence, that a § 363 sale would proceed so quickly that other potential bidders would not have time to do their due diligence, which presumably decreases the likelihood of competing

bids and correspondingly increases the chances that the Brown Insiders, through Newco, would secure the Debtors' assets.  The insiders did not have their own counsel at this time for this discussion.  The Brown Insiders eventually reached an agreement with Guggenheim.

In March 2010, shortly before the filing of the bankruptcy petition, the Brown Insiders formed Newco, as contemplated in the Draft and Revised Proposal Memos, using a different name: Brown Media Corporation ("Brown Media").  The Brown Insiders were the only equity stakeholders in Brown.  At this time, Fox provided Dempsey with a "preliminary list of tasks" that would need to be completed, including "[c]omplete negotiations regarding the [Brown Media asset-purchase agreement ("APA")]."  Fox advised Dempsey that "[o]bviously, this presumes that Newco has been formed *and retained counsel with whom we can negotiate to the extent necessary*."

On April 7, 2010, approximately three weeks prior to the date of the Debtor's bankruptcy petition, on Fox's suggestion and recommendation, Brown Media retained Fox's friend, Richard Levy, to represent it in the course of negotiating the Brown Media APA with the Debtors, under which Brown Media would serve as the stalking-horse bidder in the contemplated auction sale of the Debtors' assets under 11 U.S.C. § 363.  Fox had become acquainted with Levy when they worked together at a prior law firm.  Fox and KLG represented the Debtors in these stalking-horse negotiations, which lasted for several weeks, resulting in the execution of the Brown Media APA sometime after the instant bankruptcy petitions were filed.

KLG had previously informed the Brown Insiders that, if they wanted to participate in any auction sale of the Debtors' assets in bankruptcy, the Debtors would need to appoint an independent director to oversee all aspects of the sale, so as to remove any taint of conflicting interests from the transaction.

Initially, the principals of the Debtors wanted to hire Joseph Szfraniec, a director of BPC, for the job, and they offered Szfraniec the position on behalf of the Debtors. However, Szfraniec declined the position.

Fox later suggested and recommended his former colleague, Thomas Carlson, a CPA, and a Certified Insolvency and Restructuring Advisor, for the position of independent director. Carlson is not an attorney, but he has significant experience in restructuring, reorganization, and auditing practice. However, Carlson had no experience in the publishing business. Fox first became acquainted with Carlson in connection with the *Delphi* bankruptcy case. In that case, Fox represented Wilmington Trust, and Carlson was financial advisor to the creditors' committee. The Debtors' respective managing boards approved Carlson on April 30, 2010, the date the Debtors filed their petitions.

Between April 30, 2010 and May 1, 2010, each of the Debtors filed "bare bones" petitions for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code. The cases were ultimately consolidated for procedural purposes only. On May 4, 2010, three to four days after the bankruptcy filings, KLG moved to sell the Debtors' assets under 11 U.S.C. § 363, on expedited notice, with Brown Media as the proposed introductory bidder.

Each of the Debtors subsequently filed an application pursuant to 11 U.S.C. §§ 327 and 1107 to retain KLJ as counsel for their respective bankruptcy estates. Pursuant to Federal Rule of Bankruptcy Procedure 2014, KLG was required to submit an affidavit setting forth all connections between KLG and any parties in interest to the bankruptcy cases. Acting for KLG, Fox filed such an affidavit (the "Rule 2014 Affidavit"). The Rule 2014 Affidavit stated that the Debtors had 1,250 creditors, of whom 483 were being, or had been, represented by KLG in unrelated matters. An annexed exhibit alphabetically listed all 483 creditors. Among the

creditors listed are PNC and Wilmington Trust.  The list specifies that PNC and Wilmington Trust were the agents for certain of the Debtors' lienholders.  KLG admits that it could not have sued either PNC or Wilmington Trust on behalf of the Debtors if such litigation became necessary.

On June 28, 2010, the Bankruptcy Court approved the Debtor's retention of KLG. Fox and Moser were lead counsel and the primary billing attorneys for the Debtors.  Fox and Moser have since left KLG for other law firms.

On July 19, 2010, the § 363 sale of the Debtors' assets took place, lasting for roughly 23 hours, with multiple rounds of vigorous bidding, primarily between PNC and Brown Media. Levy appeared at the auction sale as counsel for Brown Media, and Fox appeared as counsel for the Debtors.  The assets were sold in 3 different lots.  Brown Media was declared the successful bidder for most of the Debtors' assets.  However, Guggenheim withdrew its financing commitment before Brown Media could close.  Thus, PNC, as the next-highest bidder, became the successful bidder.  The total purchase price tendered for the Debtors' assets, including cash and debt forgiveness, was approximately $27,090,000.

On June 16, 2011, the Court confirmed the Debtors' third amended joint plan of reorganization (the "Plan").  The Plan established the Brown Publishing Company Liquidating Trust to succeed to the assets of the Debtors' estates, including all causes of action.  Carlson was appointed Liquidating trustee.  The Plan provided that the Liquidating Trust could retain KLG on a contingent fee basis to pursue affirmative recoveries, which it did.

Meanwhile, on March 29, 2011, shortly before the Plan was confirmed, Carlson, Brown, and Dempsey, together with Brown's counsel, met at KLG's offices in Manhattan.  At this meeting, Brown learned that he would likely be sued on behalf of the liquidating trust, yet he

11

did not raise any opposition to confirmation.

Almost a year later, on March 15, 2012, Brown filed a *pro se* motion to disqualify KLG from representing the liquidating trust in connection with the litigation against him, referred to herein as the "Brown Adversary Proceeding" (the "Disqualification Motion").  The basis for the Disqualification Motion was that a conflict of interest arose, due to the fact that, pre-petition, KLG, rather than acting exclusively for the benefit of its "official" clients, the Debtors, was really acting for the benefit of Brown and other Brown Insiders, to help them to obtain the Debtors' assets in bankruptcy.  On May 6, 2012, KLG, on behalf of the liquidating trust under seal, filed its objection to the Disqualification Motion under seal.

On September 17, 2012, this time, with the aid of counsel, Brown filed a motion to amend the Disqualification Motion, citing newly discovered facts concerning KLG's representation of PNC and Wilmington Trust, and KLG's failure fully to disclose the nature of the representation in its Rule 2014 Affidavit (the "Motion to Amend").  The Motion to Amend also specifically asked that this Court order KLG to disgorge any legal fees it had been paid in connection with the instant bankruptcy cases.

While the Disqualification Motion was pending, Fox left KLG and joined a new law firm, Polsinelli.  Then, on behalf of the trust, KLG moved to withdraw and substitute Fox and Polsinelli as counsel for the Liquidation Trust in the adversary proceedings.  Fox had been the primary KLG partner in the matter and the one with most of the conflicts complained about in the Disqualification Motion.

On April 29, 2013, following a three-day evidentiary hearing, the Bankruptcy Court disqualified KLG based on (1) an implied, undisclosed, pre-petition attorney-client relationship between KLG and the Brown Insiders and (2) KLG's failure to make proper Rule 2014

disclosures. <u>In re Brown Pub. Co.</u>, 10-73295, 2013 WL 1795924 (Bankr. E.D.N.Y. Apr. 29,

2013).  In particular, the Bankruptcy Court found that "even though KLG never had a formal

arrangement in place to establish such a relationship with Roy Brown or any other BPC insiders,

and even though the First Engagement Letter says that KLG was not signing on to represent

insiders, these facts do not foreclose the existence of such a relationship if one did in fact exist in

substance." <u>Id.</u> at *13.  The Bankruptcy Court further stated:

> Even if Mr. Fox is entirely truthful and accurate in stating that he and Joel
> Dempsey never actually directly discussed those aspects of the Warrant Put
> Memo that related solely to the insiders' interests, the fact remains that Mr.
> Dempsey asked him for advice on those points.  Indeed, Mr. Dempsey
> unequivocally testified that he reached out to Mr. Fox not only on behalf of the
> Debtors, but also on behalf of BPC's shareholders, which included Roy Brown.
> Further, the Warrant Put Memo clearly raises issues that pertain almost
> exclusively to the interests of BPC insiders.  Indeed, the issue of whether the
> insiders could maintain control by virtue of the New LLC Transaction was a
> primary theme of the Warrant Put Memo.
>
> Therefore, under Restatement § 14(1), Mr. Dempsey, on behalf of Roy Brown and
> others, manifested to Mr. Fox a desire that Mr. Fox provide them with legal
> services, i.e. advice, with respect to their individual interests.  Moreover, while
> Mr. Fox may not have overtly manifested consent to provide such advice, and
> may indeed never have actually provided it, he did "fail to manifest lack of
> consent to do so" in that the record is devoid of any instance where Mr. Fox
> refused to provide the advice sought with respect to the insiders' interests.
>
> Indeed, a lawyer "may . . . indicate consent [to provide legal services] by action,
> for example by performing services requested . . . ."  Restatement § 14,
> comment e.  Mr. Fox admits that he did perform services requested in that he did
> offer some input on the Warrant Put Memo, which again inextricably blended
> considerations of both the Debtors' and the insiders' interests.  Moreover, in
> light of the foregoing, Mr. Fox clearly had reason to suspect that Mr. Dempsey,
> on behalf of Roy Brown and the other insiders, was relying on Ed Fox to
> provide advice with respect to the insiders' interests in addition to the Debtors'.
>
> The Draft Proposal Memo, the Revised Proposal Memo, and Draft Responsive
> Memo patently were not written on behalf of the Debtors, but plainly were
> drafted by and on behalf of Roy Brown and other insiders of BPC, and they
> clearly addressed the interests of Roy Brown and "certain managers" of BPC.
> Mr. Dempsey clearly asked Mr. Fox for input with respect to these memoranda,
> and Mr. Fox gave it.  In commenting on the Revised Proposal Memo, Mr. Fox

opined that the range of sale prices from $50-60 million was "better" than the Draft Proposal Memo's fixed offer of $60 million.  Even though KLG contends that Mr. Fox offered this input in order to look out for the Debtors' interests (since asset-valuation has serious implications in any complex bankruptcy case), the trial in this matter was not the time for Mr. Fox to make this clear; he should have made this clear in his initial replies to Mr. Dempsey. See NY RPC 1.13 (requiring that, where the lawyer for an organization communicates with constituents of the organization under circumstances where the constituents' interests might differ from the organization's, the lawyer must make clear that s/he represents the organization, not the constituents).

Moreover, when Mr. Dempsey sent the Draft Responsive Memo to Mr. Fox, Mr. Fox replied with an email stating simply that KLG would – "take a look and get back to you."  Sometime later, Mr. Fox sent the Edited Responsive Memo, the black-lined version of which contains numerous, substantial revisions to the Draft Responsive Memo.  Again, KLG contends that these edits were made so as to look out for the Debtors' interests, but even if this were true, the right forum for KLG to make this clear was not at trial, or in its present briefs, but rather in the very email containing the Edited Responsive Memo.

Thus, we have a situation where Messrs. Brown and Dempsey "manifested their desire" that KLG give them legal advice with respect to their own individual interests, and reached out to Mr. Fox for legal advice on several memoranda which patently pertained to their interests.  Mr. Fox, rather than refusing to provide such advice, or at least making clear that any advice he did provide was only on behalf of the Debtors, instead simply offered input which Messrs. Brown and Dempsey could easily have interpreted as being for their own personal benefit.  Therefore, Messrs. Brown and Dempsey sought legal advice from Mr. Fox; Mr. Fox failed to manifest lack of consent; and the circumstances clearly indicated that Messrs. Brown and Dempsey had reason to rely on Mr. Fox's providing the advice.

The Court is aware that attorneys retained to represent a corporate debtor are often asked to provide some guidance or legal advice to its principals on their personal behalf.  At times, there is a fine line between debtor's counsel's capacity to differentiate between adequate information on behalf of the debtor and legal advice strictly for the benefit of the individuals.  The insiders need to be informed that they need to retain separate counsel to pursue their individual needs.  There is no evidence in this record that this was done.  Therefore, the Court finds that a prepetition attorney-client relationship arose between KLG and the BPC Insiders.

Id. at *14-15.

However, "[m]ore disturbing" to the Bankruptcy Court "[wa]s the fact that Mr. Fox's

Rule 2014 Statement on behalf of KLG fails to abide by the spirit and intent of Rule 2014 [of the

Federal Rules of Bankruptcy Procedure." Id. at *15.  In this regard, the Court found:

> KLG filed a general statement indicating that they may or may not have been
> retained by certain creditors of the debtor and, to the best of their knowledge, they
> did not know of any conflict.  This statement did not point out which of the 483
> creditors, attorneys or parties in this case it had had specific dealings with or
> which ones the firm had a continued legal relationship with at or about the time of
> the filing of this debtor's case.  At a minimum, it is incomplete.  It did not set forth
> any circumstances that might have any adverse interest in connection with the
> present representation of the Debtor.  KLG's failure to point out its prior
> relationship to significant creditors, and to its prior relation with the insiders,
> belies the spirit of Rule 2014.
>
> . . .
>
> [E]ven assuming, as KLG vigorously argues, that it's concurrent or prior
> representation of 483 of the debtor's creditors never gave rise to a disabling
> conflict of interest, disqualification may be warranted if they did not adequately
> disclose the nature and scope of the representation under Rule 2014.  If KLG was
> relying on Roy Brown's signature on the conflict waiver letter to cure and absolve
> KLG of any conflict arising from its representation of creditors, that waiver is
> immaterial as to whether KLG adequately disclosed the nature and scope of
> representation of specific parties so that the court and the uninformed debtor's
> creditors could make a determination as to whether they should be retained in this
> case.
>
> Clearly, Mr. Fox knew that he needed to obtain a waiver from the principals of
> the debtor in regard to his relationship with the banks that also had a relationship
> with the Debtor.  However, that waiver agreement is between the debtor and
> KLG.  It does not waive KLG's duty to the court pursuant to Rule 2014.  For KLG
> to merely acknowledge in its Rule 2014 Affidavit that it had represented 483 of
> the debtor's creditors, without more, is inadequate disclosure.  KLG's failure to
> point out which counsel it had worked with and merely that it represented certain
> creditors who remained creditors in the case belies the spirit of the mandate for
> adequate disclosure.  Even if this inadequate disclosure was unintentional and
> inadvertent, it does not excuse the failure to disclose possible conflicts of interest.

Id. at *16.  The Bankruptcy Court reserved decision on sanctions, stating as follows:

> While the Court finds both that KLG was conflicted throughout its representation
> of the Debtors in this case, and that KLG made inadequate disclosure in its Rule
> 2014 Affidavit, the Court is not now in a position to decide what sanctions, if any,

should be imposed as a result.  Therefore, the matter of sanctions will await a
separate hearing at a later date.

Id. at *13.  The Bankruptcy Court also indicated that, after a hearing on sanctions, an

order "w[ould] be entered in this case on all matters raised and addressed." Id. at *17.

On May 16, 2013, following oral argument, the Bankruptcy Court indicated that it would

deny KLG's motion to substitute the Polsinelli law firm.  The Bankruptcy Court noted on the

record that "Fox clearly papered the case to look as if he were representing the debtor only.  But

his actions say differently.  Unfortunately for him, Mr. Brown kept every e-mail."

On May 20, 2013, the Bankruptcy Court formally denied the motion to substitute and

directed the Liquidation Trustee to secure new counsel independent of Fox and KLG for the

reasons stated on the record at the May 16, 2013 hearing and in the order dated April 29, 2013.

On June 27, 2013, the Bankruptcy Court made the following remarks on the record:

> [F]or two and a half years while this case was going on Mr. Brown never
> said anything about there being a reason to disqualify KLG Gates.  All along
> when he thought that KLG Gates was helping him that was okay.  It did not
> -- he did not bring the issue that you [Mr. Brown's counsel] provided him
> with to the Court until he became subject to litigation, and then felt that it
> was a good tactic.
>
> Now, he has a legal background, he knows when to bring an action or when
> not to . . .

On July 8, 2013, the Bankruptcy Court (1) confirmed KLG's disqualification from the

main bankruptcy case; and (2) directed KLG to return $100,000 of the money it made in the

bankruptcy case to the Trust.  KLG, rather than the Liquidation Trustee, appealed the July 8,

2013 and April 29, 2013 orders pursuant to 28 U.S.C. § 158(a).

On December 18, 2013, after the parties fully briefed the appeal, this Court directed the

parties to submit supplemental memoranda concerning KLG's standing to appeal from the

Disqualification Orders.

The Court will first address whether the orders appealed from are final under 28 U.S.C. § 158(a); then whether KLG possesses standing to appeal those orders; and subsequently the merits of the appeal.

## II. DISCUSSION

A.  The Standard of Review

Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.  A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree." Fed. R. Bankr. P. 8013.  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. . . ." Id.  Legal conclusions by the bankruptcy judge receive *de novo* review on appeal. In re Charter Commc'ns, Inc., 691 F.3d 476, 483 (2d Cir. 2012), cert. denied, 133 S. Ct. 2021 (2013).

"While the bankruptcy court's findings of fact are not conclusive on appeal, 'the party that seeks to overturn them bears a heavy burden.'" In re Lehman Bros. Holdings, Inc., 415 B.R. 77, 83 (S.D.N.Y. 2009) (quoting H & C Dev. Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (2d Cir. BAP 1999)).  "A finding is 'clearly erroneous' when" the reviewing court is "left with the definite and firm conviction that a mistake has been made." In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

B.  Finality

As an initial matter, Brown contends that KLG's appeal should be dismissed because KLG did not appeal from the Bankruptcy Court order dated May 20, 2013, which denied the Liquidating Trust's motion to substitute Polsinelli as counsel for KLG.  In response, KLG

contends that the Bankruptcy Court order dated July 8, 2013 was the only final and appealable order from which KLG could have appealed its disqualification.

"The standards for determining finality in bankruptcy differ from those applicable to ordinary civil litigation.  This difference is due to the fact that a bankruptcy proceeding is umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant and that often involve decisions that will be unreviewable if appellate jurisdiction exists only at the conclusion of the bankruptcy proceeding." In re Quigley Co., Inc., 676 F.3d 45, 51 (2d Cir. 2012)(internal citations and quotation marks omitted), cert. denied, 133 S. Ct. 2849, 186 L. Ed. 2d 908 (2013).

Bankruptcy court orders are considered final and therefore appealable as of right only when they "finally dispose of discrete disputes within the larger case." Shimer v. Fugazy (In re Fugazy Express, Inc.), 982 F.2d 769, 775 (2d Cir. 1992).  A discrete dispute "means at least an entire claim on which relief may be granted." Id. at 775-76.

A review of the case law indicates that the Second Circuit has apparently yet to address whether, in a bankruptcy context, an order assessing sanctions against an attorney is appealable as of right.  That issue was considered by the Third Circuit in In re Jeannette Corp., 832 F.2d 43 (3d Cir. 1987), a case in which a debtor appealed a decision of the bankruptcy court finding that the debtor's counsel violated certain procedural rules and directing that a hearing be held to determine whether sanctions should be imposed.  The district court affirmed the bankruptcy court decision.  The Third Circuit dismissed the appeal for lack of finality, holding that "[i]f the sanctions are to be an assessment of counsel fees or expenses, they must be fixed before the order is final and appealable." Id. at 46; see also In re Hotel Syracuse, Inc., 1991 WL 274253, at *4, 1991 U.S. Dist. LEXIS 18580, at *12-13 (N.D.N.Y Dec. 18, 1991) ("In the case at bar, the

18

Bankruptcy Court ordered . . . $500 in sanctions.  Because the sanctions were 'fixed' by the Bankruptcy Court, the court finds that that portion of the Bankruptcy Court's September 20 Order requiring the payment of sanctions . . . to debtor is final and therefore appealable as of right."); see generally In re Hermosilla, 11-045 (BAP)(MB), 2011 WL 6034487, at *2 (B.A.P. 1st Cir. Nov. 14, 2011)("A bankruptcy court order imposing sanctions for violations of Bankruptcy Rule 9011 is a final, appealable order where, as here, it resolves all of the issues pertaining to a discrete claim.")

In this case, the Court finds that the Bankruptcy Court order dated July 8, 2013 affixing a monetary sanction of $100,000 is final and appealable.  The fact that KLG is not appealing the amount of the sanction does not alter the conclusion that the July 8, 2013 order finally determined the Disqualification Motion.

Further, the Bankruptcy Court's separate treatment of the substitution motion and the Disqualification Motion indicates that, contrary to Brown's contention, they should be viewed separately here.  Indeed, the Bankruptcy Court order dated May 20, 2013 denying the substitution motion and directing the retention of new counsel did not impose sanctions or otherwise "conclude" or address the Disqualification Motion.

In short, the Court rejects Brown's argument that KLG's appeal should be dismissed on finality grounds and proceeds to address KLG's appellate standing.

C.  Standing

Although Brown now essentially concedes KLG's appellate standing, it is well-settled that federal courts are under an independent obligation to examine their own jurisdiction. See Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed.2d 556 (1984).  Therefore, the Court briefly addresses KLG's appellate standing.

19

Having reviewed the supplemental memoranda, the Court is satisfied that KLG has standing to appeal from the Disqualification Orders.  The Second Circuit has held that "[w]here an award of sanctions runs only against the attorney, the attorney is the party in interest and must appeal in his or her name." Guckenberger v. Prudential Ins. Co. of Am., 472 F. App'x 69, 70 (2d Cir. 2012)(quoting DeLuca v. Long Island Lighting Co., Inc., 862 F.2d 427, 429 (2d Cir. 1988)); Douglas v. Merck & Co., 456 Fed. Appx. 45, 47 (2d Cir. 2012) ("[A]n attorney may appeal a decision where the district court imposes a tangible sanction or makes an express finding that a lawyer has committed specific acts of professional misconduct.") (internal quotations and citation omitted).  Further, in a bankruptcy case, an appellant must be "a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court." Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.), 468 B.R. 603, 612 (S.D.N.Y. 2012) (internal quotation marks omitted).

In this case, the Court finds that, even without the monetary sanctions, the disqualification itself qualifies as a tangible sanction having a pecuniary impact on KLG and that confers appellate standing on KLG.  Indeed, the Court recognizes the reputational harm to KLG as well as the fact that the disqualification required it to forfeit out-of-pocket expenses, plus approved contingency fees specifically authorized under the Plan.

The Court acknowledges contrary case law outside this Circuit.  For example, In re Blinder Robinson & Co., Inc., 132 B.R. 759, 760 (D. Colo. 1991), the trustee of a bankruptcy estate moved to disqualify the attorneys representing a creditor of the estate.  The Bankruptcy Court granted the motion to disqualify, and both the creditor and the attorneys appealed.  The trustee contended that the attorneys never became parties to the bankruptcy proceeding, and, consequently, lacked standing to challenge the disqualification order.  The District Court

dismissed the attorneys' appeal for lack of standing, rejecting as insufficient to confer standing the argument by counsel that their personal reputations were at issue.

Similarly, in In re M.T.G., Inc., 298 B.R. 310, 316 (E.D. Mich. 2003), a motion was made to vacate an employment order authorizing a successor Chapter 7 trustee's retention of an attorney, who previously was counsel for a Chapter 11 debtor.  The Bankruptcy Court granted the motion to vacate, and the successor trustee and attorney appealed.  The Appellees contended that that the attorney lacked standing to bring the appeal.  The District Court noted that while the contention that the attorney lacked appellate standing "may be true," there was no standing issue for the appeal because it was brought by both the successor trustee and the attorney. 298 B.R. at 316 n. 12.

Neither In re Blinder nor In re M.T.G., Inc. involved a monetary sanction against the attorneys beyond disqualification, and, therefore, could be distinguished on that ground. However, as noted above, this Court finds that the disqualification in this case, even without the monetary sanction, suffices to confer appellate standing on KLG.  To the extent In re Blinder and In re M.T.G., Inc. hold otherwise, the Court declines to follow the rationale of those non-binding decisions.

The Court notes that a contrary finding in this regard would effectively exempt the Disqualification Orders from appellate review, as KLG is the only party that has an interest to pursue an appeal of those orders.  Indeed, the Debtors and the Liquidating Trust are in an adverse position to KLG with respect to this issue, as they stand to benefit as the recipients of the $100,000 sanction.  For the foregoing reasons, the Court finds that KLG has standing to appeal the Disqualification Orders.

D.  Whether the Bankruptcy Court Erred in Implying an Attorney-Client Relationship Between KLG and The Brown Insiders

Brown also asserts that the Bankruptcy Court erred in applying the Restatement § 14(1) (Third) of the Law Governing Lawyers to imply a pre-petition attorney-client relationship between KLG and the Brown Insiders.  In so doing, Brown contends, the Bankruptcy Court improperly restricted its consideration of the disqualification issue to whether Brown "reasonably believed" that KLG represented the Brown Insiders.  Rather, Brown maintains, the Bankruptcy Court should have applied a six-factor test sometimes used in the Southern District of New York to adjudicate the existence of an attorney-client relationship between the Brown Insiders and KLG.

However, the Court need not evaluate the existence of an attorney-client relationship because, in the Court's view, Brown's delay in bringing the disqualification motion amounted to a waiver of his right to contest this alleged conflict of interest.  Indeed, "[a]n unjustified delay in bringing a motion to disqualify provides a separate ground to deny the relief requested in the underlying motion." In re WorldCom, Inc., 311 B.R. 151, 166-67 (Bankr. S.D.N.Y. 2004); Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy L.L.P., et al. (In re Enron Corp., et al.), No. 02 Civ. 5638 (BSJ), 2003 WL 223455 at *4 n. 2 (S.D.N.Y. Feb. 3, 2003)(holding that the bankruptcy court was correct in finding an unjustified delay in bringing the motion to disqualify provided a separate ground to deny relief, where motion was brought nearly two months after the underlying basis for the disqualification motion was known); In re 444 N. Nw. Hwy, LLC, 477 B.R. 88, 91 (Bankr. N.D. Ill. 2012)("Even if the grounds discussed above for possible disqualification could be established, under circumstances presented here, the possibility of asserting that has been waived in this bankruptcy case by the extraordinary delay of Mr. Heinz to

wake up to his former contact with Northbrook's law firm and inform his lawyers about the earlier contact with a lawyer in the firm.").

"To determine whether such a waiver occurred, courts look to a variety of factors, of which the length of delay in bringing a disqualification motion is an important (but not determinative) consideration." Hudak v. I.R.S., CIV 11-1271 (MJG), 2012 WL 6726705, at *4 (D. Md. Dec. 26, 2012).  Other factors pertinent to the assessment include:

> When the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and, in particular, whether the motion was delayed for tactical reasons; and whether disqualification would result in prejudice to the nonmoving party.

Id.

Here, the Court notes that (1) Brown delayed almost three years until bringing the Disqualification Motion in 2012, though he knew of the alleged conflict between KLG and the Brown Insiders as early as 2008 or 2009; (2) Brown relied on advice from other law firms during this delay; (3) Brown concedes that he delayed for tactical purposes; and (4) disqualification prejudiced the Liquidating Trust because the Plan had been effective for nearly nine months before Brown filed the Disqualification Motion.  Thus, all of the above-mentioned factors weigh in favor of waiver.

In short, the Court finds that Brown's delay in bringing the disqualification motion amounted to a waiver of his right to contest this alleged conflict of interest.

### E.   Whether the Bankruptcy Court Erred in Determining that the Rule 2014 Statement Lacked Sufficient Detail With Regard to KLG's Prior Relations With Certain Creditors

The Court finds no error in the Bankruptcy Court determination that KLG should have provided more detail in its Rule 2014 Statement with regards to its prior relations with certain creditors.

Section 327 of the Bankruptcy Code provides that in order to be employed by a debtor, counsel may not "hold or represent an interest adverse to the estate" and must be a "disinterested person[]." 11 U.S.C. § 327(a).  In furtherance of Section 327, Rule 2014(a) of the Federal Rules of Bankruptcy Procedure requires that an application for employment of an attorney "be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest. . ."  "By requiring parties to disclose all connections, the rule provides bankruptcy courts with sufficient information to determine whether any connection disqualifies the applicant from the employment sought, or whether further inquiry should be made before deciding whether to approve the employment." In re Persaud, 496 B.R. 667, 675 (E.D.N.Y. 2013).  "The decision as to what information to disclose should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." Id. (quotation marks and citation omitted).

Courts have emphasized the importance of making thorough disclosures of any connections as required by Rule 2014 when seeking to employ counsel pursuant to Section 327. In re Leslie Fay, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994); In re Biddle, 2012 WL 6093926, at *3-5 (Bankr. D.S.C. Dec. 6, 2012).  This obligation to make disclosure of any connection continues beyond the court's approval of an employment application. Forizs & Dogali, P.A. v. Siegel, 2012 WL 4356266 at *3 (M.D. Fla. Sept. 24, 2012).  Namely, the obligation to disclose is a continuing one. Id.

Here, KLG filed a Rule 2014 Statement disclosing all of its 483 former and current clients, in alphabetical order, who may have had conflicts with the Debtors.  However, KLG failed to advise the Court that Fox, its lead billing partner, personally represented PNC in the *Enron* bankruptcy case and Wilmington Trust in the *Delphi* bankruptcy case.

24

KLG contends that its research has not uncovered a single instance where a law firm was disqualified for failure to comply with Rule 2014 when the firm identified all potential conflicts, yet failed to disclose individual attorneys who staffed those matters.  Relying on <u>In re Fibermark, Inc.</u>, 04-10463, 2006 WL 723495 (Bankr. D. Vt. Mar. 11, 2006), KLG argues that imposing sanctions against it for failing to reveal Fox's prior personal representation of PNC and Wilmington raises a due process question because KLG had no prior notice of such a disclosure requirement.

While the decision by the drafters of the Bankruptcy Rules to use the vague term "connections" in Rule 2014(a) may have been "an unfortunate one," <u>In re Fibermark, Inc.</u>, 2006 WL 723495, at *9, citing 9 L. King, Collier on Bankruptcy, ¶ 2014.05 (15th ed. 2005) because "[i]t is difficult to comprehend how the drafters intended this to be enforced without any clarification as to the definition of the term, its breadth or the time period covered," <u>In re Fibermark, Inc.</u>, 2006 WL 723495, at *9, the broad reach of Rule 2014 suggests that the word encompasses individual attorneys, as well as their law firms. See <u>In re Southampton Brick & Tile, LLC</u>, 11-75928, 2012 WL 4850048, at *7 (Bankr. E.D.N.Y. Oct. 11, 2012)("[t]he scope of an attorney's disclosure obligations under Rule 2014 . . . are considerably broad."); <u>In re Persaud</u>, 496 B.R. at 675 ("Rule 2014 is a broad rule of disclosure"); <u>In re Source Enterprises, Inc.</u>, 06-11707 (AJG), 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008)( "The term 'connections' is broad and is strictly construed for purposes of Bankruptcy Rule 2014."). Indeed, "[c]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." <u>In re Source Enterprises, Inc.</u> 2008 WL 850229, at *8. Therefore, the Court finds no due process violation by virtue of the Bankruptcy Court's

disqualification of KLG for failing to disclose Fox's personal involvement in the *Enron* and *Delphi* matters.

KLG contends that, in any event, under In re Southampton Brick and Tile, LLC, a previous decision by Judge Eisenberg, counsel's disclosures, coupled with the petition and bankruptcy schedules which listed both PNC and Wilmington as the agents for the Debtors' secured lenders, provided the Court with sufficient information to evaluate whether there was a disabling conflict of interest. Id. at *8 ("RMF's disclosures concerning Brodsky, together with Debtor's petition and schedules, did present the Court with enough information to evaluate whether RMF's relationship with Brodsky presented a disabling conflict of interest, so that any non-compliance with Rule 2014 here was merely technical, at most.").

However, in this case, the petition and bankruptcy schedules fail to rectify the deficiencies in the 2014 Statement because they do not identify Fox as the attorney who represented PNC and Wilmington in the *Enron* and *Delphi* bankruptcy cases, respectively. Similarly, the fact that Brown may have known that KLG had previously represented PNC and Wilmington does not alter this analysis because there is no indication that Brown was aware of Fox's personal involvement in those cases.

The Court also notes that the Conflict Waiver Letter did not specify Fox's personal representation in those bankruptcy cases.  In that regard, the non-compliance with Rule 2014 was not merely technical. Cf. Matter of Futuronics Corp., 655 F.2d 463, 469 (2d. Cir. 1981) (construing substantially similar statutory predecessor to Rule 2014 and explaining that merely technical non-compliance with disclosure requirements might be excused where the relevant facts are "generally disclosed" to the Court, and where the Court knew the relevant facts at the time of appointment of counsel.)

26

KLG also cites Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 133 (2d Cir. 2005) for the proposition that an attorney's conflicts are ordinarily imputed to his firm based on the presumption that attorneys share client confidences. However, it does not follow that the conflict no longer applies to the individual attorney – here, Fox – or that identification of such an individual counsel is irrelevant to a Rule 2014 analysis.

Finally, KLG contends that disclosure of Fox's personal involvement in the *Enron* and *Delphi* matters was not required under Rule 2014 because those matters are unrelated to the underlying bankruptcy matter too. The Court disagrees.

In this regard, the Court finds KLG's reliance on In re Dynamark, Ltd., 137 B.R. 380 (Bankr. S.D. Cal. 1991) unpersuasive. There, the court authorized the employment under § 327(a) of counsel who concurrently represented the debtor's largest secured creditor on unrelated matters. The Dynamark court employed a balancing approach to arrive at this result, stating that "no actual conflict or adverse interest has surfaced which would outweigh the debtor's right to counsel of his choice." Id. at 381. However, this Court agrees with the reasoning of the district court in In re Envirodyne Indus., Inc., 150 B.R. 1008, 1018 (Bankr. N.D. Ill. 1993), which rejected this aspect of Dynamark. In In re Envirodyne Indus., Inc., the court stated:

> The [Bankruptcy] Code does not authorize a bankruptcy court to weigh the totality of the circumstances when permitting the employment of professionals. Rather, the Code provides guidelines so that the court is not permitted to adopt a balancing approach. If all bankruptcy courts adopted the narrow definition of conflict of interest applied in Dynamark, then the Code's conflict of interest barriers would be rendered ineffective and only the most severe and open conflicts would be prohibited.
>
> Dynamark is inconsistent with § 327(a). It is clear that the standards of § 327(a) are to be strictly construed due to the unique nature of the bankruptcy system. Multiple representations which may be tolerable in a commercial setting after full disclosure are not permissible in the bankruptcy setting.

27

Id. (internal citations omitted).

It is true that "'boilerplate' disclosure may cover an inadvertent failure to disclose an insignificant connection, but does not suffice for known connections with parties presenting a significant risk of adversity." In re Granite Partners, L.P., 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998); In re Leslie Fay Cos., 175 B.R. at 537.   However, there is nothing in the record to suggest that the failure to disclose in this case was unintentional. See In re Leslie Fay Companies, Inc., 222 B.R. 718, 721 (S.D.N.Y. 1998) (in bankruptcy context, the moving party "bear[s] the burden of proof in establishing a conflict of interest"), aff'd sub nom. Falbaum v. Leslie Fay Companies, Inc., 182 F.3d 899 (2d Cir. 1999).

In sum, the Court finds that the Bankruptcy Court did not err in its determination that KLG failed to provide sufficient detail in its Rule 2014 Statement with respect to Fox's relationships with PNC and Wilmington.

F.   Whether the Bankruptcy Court Erred in Determining that the Rule 2014 Statement Lacked Sufficient Detail With Regard to KLG's Prior Relations With Other Parties in Interest

The Bankruptcy Court also expressed a concern about a lack of disclosure with respect to Fox's past relationships with Levy, the KLG-selected counsel who began serving as the Brown Insiders' lawyer prior to the bankruptcy filing, and Carlson, the KLG-selected Independent Director.  It is not clear how much weight, if any, the Bankruptcy Court placed on this lack of disclosure.  However, to the extent the Bankruptcy Court based its determinations on KLG's failure to disclose this information, the Court finds that the determination was made in error as such disclosures are beyond the scope of Rule 2014.

"It is quite typical for a bankruptcy professional who works primarily in chapter 11 cases to have dealt with the other bankruptcy professionals in any particular case, on many previous

occasions." In re Fibermark, Inc., 2006 WL 723495, at *11.  Brown cites to no case mandating disclosure of these types of prior relationships, and even concedes that the Bankruptcy Court may have found these non-disclosures "innocuous" had KLG's other disclosures been satisfactory.  Absent prior judicial notice that such disclosures were required, the Court finds that sanctioning KLG for these non-disclosures would implicate due process concerns and that this type of "ambush [would] serve no legitimate purpose." Id.

In sum, the Court finds that the Bankruptcy Court improperly considered Fox's prior relationships with Levy and Carlson.

### III. CONCLUSIONS

In conclusion, the Court finds that Brown's delay in bringing the Disqualification Motion constituted a waiver of his right to contest the alleged conflict of interest between KLG and the Brown Insiders.  The Court further finds that the Bankruptcy Court (1) properly found that KLG failed to provide sufficient detail in its Rule 2014 Statement with respect to Fox's prior relationships with PNC and Wilmington and (2) improperly considered Fox's prior relationships with Levy and Carlson.

At this juncture of the litigation, the Court declines to uphold the disqualification of KLG in the first instance on the basis of its failure to sufficiently disclose Fox's prior relationships with PNC and Wilmington. Ford v. Bd. of Managers of Cameo Townhouses at Massapequa, 08CV2740 (ADS), 2009 WL 425888, at 85 (E.D.N.Y. Feb. 18, 2009)(Spatt, J.)("The Bankruptcy Court made no ruling with respect to Ford's cross-motion for damages incurred by Cameo's violation of the automatic stay.  As the Court of first instance in this context, the Bankruptcy Court should have such an opportunity."); In re Hirsch, 339 B.R. 18, 33 (E.D.N.Y. 2006)("Since neither the state court nor the bankruptcy court has made any formal finding as to whether the

fraudulent conveyances have been unwound, and it is not clear whether such a finding was implicit in either of the orders of the bankruptcy court being appealed here, this Court declines to decide this issue in the first instance.").

On remand, the Bankruptcy Court should consider in the first instance whether disqualification remains appropriate on the basis of KLG's failure to disclose Fox's relationship with PNC and Wilmington.

For the foregoing reasons, it is hereby

**ORDERED**, that Brown's appeal is granted in part, denied in part, and remanded to the Bankruptcy Court for further findings consistent with this Order, namely whether disqualification remains appropriate on the basis of KLG's failure to disclose Fox's relationship with PNC and Wilmington.  The Clerk of the Court is directed to close this case.


**SO ORDERED.**

Dated: Central Islip, New York
February 18, 2014


_____*Arthur D. Spatt*_____
  ARTHUR D. SPATT
United States District Judge